**ACUSHNET CO., et al., Plaintiffs,**

**v.**

**COATERS, INC., et al., Defendants.**

**Civil Action No. 93–11219–REK.**

United States District Court,
D. Massachusetts.

Dec. 17, 1996.

David M. Jones, Roger C. Zehntner, George H. Wilcox, Wendy del Real, Kirkpatrick & Lockhart, Boston, MA, William L. Lahey, Palmer & Dodge, Boston, MA, for Acushnet Company.

Mary K. Ryan, Nutter, McClennen & Fish, Boston, MA, David M. Jones, Irene C. Freidel, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for AVX Corporation.

M. Frederick Pritzker, Wayne F. Dennison, Brown, Rudnick, Freed & Gesmer, Boston, MA, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for Brittany Dyeing and Printing Corp.

David M. Jones, Roger C. Zehntner, George H. Wilcox, Kirkpatrick & Lockhart, Boston, MA, for Amtel Inc., Berkshire Hathaway Inc., Bridgestone/Firestone, Inc., Chamberlain Manufacturing Corp., Commonwealth Electrical Company, Commonwealth Gas Company, Emhart Industries, Inc. Goodyear Tire & Rubber Co., Paramount Communications Incorporated, Teledyne Rodney Metals, a division of Teledyne Industries Incorporated, United Dominion Industries, Inc.

William J. Cheeseman, George N. Lester, Foley, Hoag & Eliot, Boston, MA, Robert A. Murphy, Andrew M. Higgins, Casner & Edwards, Boston, MA, for Cornell–Dubilier Electronics.

Alexander T. Bok, Boston, MA, Edward T. Dangel, III, Dangel, Donlan & Fine, Boston, MA, for Dartmouth Finishing Corporation.

Seth D. Jaffe, Anne D. Berlin, Jeffrey L. Roelofs, Foley, Hoag & Eliot, Boston, MA, for New England Telephone & Telegraph Company.

James A.G. Hamilton, Lawrence G. Green, Perkins, Smith & Cohen, Boston, MA, for Revere Copper and Brass Incorporated, Revere Copper Products Incorporated.

Arthur J. Caron, Jr., City Solicitor, New Bedford, MA, for the City of New Bedford.

## Opinion

KEETON, District Judge.

A curious boy named Sullivan, destined to notoriety, grew up in New Bedford, Massachusetts, in the latter part of the 19th century. Among his exploratory meanderings was a climb up a moderately sloping terrain, through tangles of brush, tall grasses and plants, and an occasional clump of trees. A mile or so up he came upon a granite outcropping just before the slope steepened toward a hilltop, some distance higher. From the outcropping, he had a grand view of a brackish bay and, off to the right in the distance, an edge of the New Bedford harbor.

As legend would have it in later years, on repeated visits to the outcropping, the youthful Sullivan found large flat stones on the banks of a small and irregular stream where it emerged from underground crevices in the hillside. Downstream, beautifully polished granite pebbles were visible through the clear flow, before the stream entered a marshland teeming with unfamiliar plant and animal life.

At the outcropping, Sullivan observed layers of weathered stone, separated by an odd pattern of cracks that sometimes made pieces break off in slabs. Imagination and optimism led to an arresting vision. Why not tap or bore holes in the right places to shape a few sizable slabs that he could, with the help of friends, move downhill and into position on top of the incessant mud at the doorstep of his modest home in one of the

less affluent sections of the bustling seaport town of horse-drawn vehicles? Success expanded the vision to doorsteps of helpful friends, and with more successes, to doorsteps of a larger number of good friends than Sullivan had anticipated he would ever have. In time, Sullivan's slabs made their way to the sidewalks of the affluent, and down to Main Street.

A teenage enterprise turned into a lifetime occupation of increasing sophistication, during which so much granite for sidewalks and buildings was taken, from its natural location downward from the outcropping, that three deep excavations remained, the largest two hundred yards across, south to north, and about a third as far east-west. Water seeping in through cracks nearly filled the excavations. Three idyllic lakes, more than a hundred feet deep, lay beneath an exposed cliff of stone, rising up from the water and extending to a point where the interrupted natural upward slope resumed.

The site was attractive to youth of the next generation. Parental orders notwithstanding, they sneaked off to congregate there in the early 1900s, and until the 1930s, for contests of skill in sailing stones so they would skip on the lake surfaces, or catching fish, the largest of which swam alone at leisurely pace, and the smallest in fast moving formations. The bolder ones among the group could also dive, swim, and otherwise cavort, with a fatality only rarely.

In later generations, the site became even more attractive to disposers of waste, especially noxious waste, and as a second town dump for bustling New Bedford, whose citizens thrived with the commerce and industry attracted by, among other amenities, its convenient and inexpensive facilities for waste disposal. By the middle of the 20th century, Sullivan's Ledge was well on the way to qualifying as one of the ten worst toxic waste sites in the United States.

Sometime, somehow, the City of New Bedford became the owner of the site. Before the stench and toxicity became so intolerable that City officials closed the site in the 1970s, Sullivan's excavations had become, successively: sparkling clear lakes; water decorated with a sheen of oil; murky broth; toxic stew; a thicker and more aromatic brew; sludge; and finally a field of solid waste covering whatever liquid had not seeped or been pushed down gradient. All that remained for the eye to behold was rubble and dirt, bulldozed to a rough and treacherous surface that occasionally trapped even the largest equipment of New Bedford's Department of Public Works. The Fire Department frequently visited the site in response to recurring clouds of noxious smoke, fed by fires of uncertain origin, perhaps started by spontaneous ignition of something or other underground in the presence of chemical waste. A seemingly inexhaustible supply of rubber and other flammables, buried at great depths, fed the fires.

In 1947, at a meeting of the City Council, a throng of petitioners asked the Council to stop the dumping and control the fires. They reported that the clouds of smoke, combined with fog, made almost impassable the road that lay north of the site and led uphill to locations where wealthier citizens could escape the sights and sounds of the City. According to the protesters, the neighborhood around Sullivan's Ledge was dangerous to the health of coughing, wheezing residents. Worse still, they predicted fatal accidents because drivers could not see through the smoke and fog that often hovered over the road in all seasons of the year, and even more frequently in early winter.

The petitioners were opposed by industry representatives, whose concerns about jobs and prosperity of the community, one may infer, were echoed by public officials and prominent citizens.

Acting in these politically sensitive circumstances, at its October 1947 meeting, the City Council voted to put the Department of Public Works in charge of the previously unsupervised site, but the vote also allowed dumping until 4:00 p.m. daily to continue, "temporarily." It was a quarter-century later, in the 1970s, when the City of New Bedford finally stopped all waste disposal at the site.

Later boring samples would support an inference that ash deposits, commencing in some spots at the bulldozed surface and else-

where a few feet below, extended as much as a hundred feet downward.

From a pragmatic perspective, one can now identify three definable categories and a fourth amorphous category of costs and harms from waste disposal at the Sullivan's Ledge site, and can foresee other categories of costs as the public and EPA press for a better solution than any yet devised.

First, the City of New Bedford has committed itself to remediation the value of which is estimated at close to $10,000,000. This commitment was memorialized in a consent decree approved, in a civil action filed by EPA against the City, in this court.

Second, the plaintiffs in this action, as "settling parties" in a separate consent decree (entered in this court) with the Environmental Protection Agency (EPA) and others, have committed themselves jointly and severally to remediation earlier estimated to cost around $10,000,000 but now conservatively estimated as likely to cost (discounted to present value) $50,000,000 and, in view of all the unknowns, possibly several magnitudes more.

Third, in a separate civil action pending in this court, EPA has sued a company that declined to join in the second consent decree—Cornell–Dubilier Electronics, Inc. (CDE)—to recover costs other than those the parties to the two consent decrees have undertaken. These costs include some EPA investigation costs and remediation costs that EPA may incur decades from now.

A fourth category of costs and harms may never be legally recognized. None of the first three categories of costs and harms, as they have been estimated for planning remediation, includes litigation costs, private and public, or anxiety and other externalities. The litigation costs and externalities, each alone, may be greater in estimated dollar equivalents of harms and losses than the sum of all the legally recognized remediation costs. A significant risk now exists that litigation costs and externalities, taken together, will dwarf the sum of the first three categories of harms and losses.

This litigation concerns only a small part of the consequences of Sullivan's enterprise and its sequels. The central matter at issue in this litigation is the legal structure for deciding who must bear what shares, and why, of whatever the costs may turn out to be for the second category—that is, the costs that plaintiffs, as "settling parties," have undertaken in the second consent decree identified above. The corporate and other entities that are plaintiffs here were defendants against EPA's claims there, and "settling parties." The process of remediation has begun, in accordance with the terms of that agreement and decree. In this civil action, plaintiffs have sued CDE as well as several other defendants against whom EPA has not yet filed any civil action in court.

A full explanation of how this civil action fits into the larger picture would be controversial and tedious beyond tolerance. Parts I and II of this opinion explain as crisply as seems feasible, without sacrificing clarity, the principal reasons for:

(1) allowing motions of three named defendants for judgment as a matter of law midway in trial, plaintiffs having "been fully heard" on identified and potentially dispositive issues, Fed.R.Civ.P. 50(a) (jury trial), see also 52(a) (advisory jury), and

(2) denying at this time a similar motion of the only remaining defendant (CDE), and making provisional rulings regarding a structure for considering whether a later motion for judgment as a matter of law on its behalf should be allowed.

Part III of this opinion says more about additional issues that must be decided before this case goes to the jury. The court has empaneled the jury to sit as usual if the court determines that genuine disputes of material fact must be decided and that the law regarding judge-jury allocation of functions makes it appropriate for the jury to decide them. Otherwise, the jury may sit in an advisory role.

## I. Issues of Law

### A. Complexity and Uncertainty

This case and this trial are extraordinarily complex. The principal elements of complexity do not concern disputes of historical fact, though many do exist. Rather, two other

kinds of complexity drive the controversy. One source of complexity is the need for answering strictly legal questions. The other is the need for working out answers to evaluative questions that are involved in applying law to complex factual circumstances. In the face of these special kinds of complexity, any resolution other than litigation all the way to final judgment appears to be unacceptable to the parties and to other interested entities (governmental and private) that are watching closely from the sidelines and may indeed be calling signals the parties do not consider themselves free to disregard.

## B. Cost Recovery Actions and Contribution Actions

The mandates of governing statutes express fundamental choices of Legislative and Executive Branch officers of government about the design and implementation of remedial measures at the sites of the most significant accumulations of toxic waste in the United States, including Sullivan's Ledge. These mandates, however, leave unresolved a host of legal issues about how the manifested fundamental choices are to be translated into rules of law sufficient for answering all the questions of law that must be answered to decide a particular case.

The governing statutes provide explicitly for proceedings in United States district courts that the statutes call "cost recovery actions" and "contribution actions."

One of the most basic issues of law remaining unsettled concerns what the First Circuit has characterized as

the relationship between cost recovery actions and contribution actions under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1987), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, § 101 *et seq.*, 100 Stat. 1613 (1986).

*United Technologies Corp. v. Browning–Ferris Industries, Inc.*, 33 F.3d 96, 97 (1st Cir. 1994). The First Circuit explicitly declared (a) that a material distinction exists between these two types of cases, (b) that different limitation periods may apply, and (c) that the case before them was a contribution action barred because filed after the applicable limitation period had run out, even though a longer limitation period would have permitted the case to go forward had it been a cost recovery action filed by the EPA rather than a contribution action filed by non-governmental entities. The distinction made a difference whether a defendant might be held liable under CERCLA in that case.

In contrast, the Second Circuit has declared more recently that a decision of the EPA "not to initiate its own enforcement action is irrelevant in determining whether a defendant might be liable under CERCLA liability." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 517 (2d Cir.1996).

One might reasonably suggest that no true conflict exists in a sense relevant to cases thus far decided, because the two circuit courts were addressing the distinctive controversies before them, each of which a dispassionate observer might think called for the outcome ordered. The cases are easily distinguishable both on factual grounds and on legal grounds, precisely framed. It is more difficult, however, to develop a convincing argument that the two opinions are not in conflict in what they say, to which district courts must be attentive and respectful, whether or not everything said was holding.

I need not and do not probe the interesting differences in what was said in these two opinions, each of which was obviously crafted with a view to providing much-needed guidance to trial courts, trial lawyers, parties drawn into CERCLA litigation, and their advisers. The reason I forego that inquiry is that, in any event, a district court within the First Circuit is bound to respect and apply the First Circuit view of the matter, whether or not it is in conflict with the Second Circuit view.

Thus, the remainder of this opinion proceeds on the premise (in contrast with that in *Betkoski*) that EPA is not and has never been a party to the case now on trial. This case is solely a contribution action. The answers I reach to the legal issues considered in the remainder of this opinion are proposed for cases that are contribution ac-

tions in districts of the First Circuit, in the present state of development of CERCLA law. Answering only these questions of law is difficult enough, and no more is required to determine the outcome of this case in this court.

### C. An Unfinished Set of Keys to Comprehending Contribution Actions

Despite complexity and uncertainty in the law, some guidelines can be formulated with a reasonable degree of confidence that they are faithful to statutory mandates and interpretive precedents a district court within the First Circuit is bound to follow on matters where precedents are in conflict.

Guidelines can also serve as keys to comprehension. The set of keys presented here is necessarily unfinished, because the work of lawmaking is unfinished. Also, the order in which the key points appear here is one of choice, not logical compulsion, and the points are numbered merely to facilitate reference.

The statutory mandate that is most relevant to claims of a settling party against others alleged to be potentially responsible parties ("PRPs") appeared first in the Superfund Amendment and Reauthorization Act of 1986.

*One.* SARA made explicit the authorization for a private right of action for contribution by a settling party against a non-settling party, but did little to provide direction on allocation issues. This statute, 42 U.S.C. § 9613(f)(1), allows a potentially responsible party to bring an action for contribution against any other PRP and states simply that,

> [i]n resolving contribution claims, the court may allocate response costs among liable parties using such *equitable factors* as the court determines are appropriate.

42 U.S.C. § 9613(f)(1). (Emphasis added.)

*Two.* Every plausible formulation of a legal test that implements an "equitable factors" mandate must include, somewhere within the formulation, explicitly or implicitly, a *factors test.*

Even though a legal test fashioned consistently with statutory and decisional guide-

lines may be in some respects an *elements test* that prescribes bright-line objective criteria of historical fact that must be satisfied, at least one part of the test (one "element") will require of the court (or court and jury, if indeed some part of the function of deciding this matter may in some circumstances be a jury function) an evaluative weighing of multiple factors to determine whether the inference may and should be drawn that the plaintiffs have satisfied the "equitable factors" requirement.

*Three.* The "equitable factors" mandate is a statement of law of a very high order of generality.

*Four.* A statutory mandate of the high order of generality of the "equitable factors" mandate places responsibility on the Third Branch to develop more particularized tests for varied kinds of cases, and procedures for applying one or another of those more particularized legal tests in particular cases.

*Five.* The work of the Third Branch in developing the more particularized legal tests required to implement the statutory "equitable factors" mandate is far from complete.

The mandate for the Third Branch to proceed with this unfinished work of reaching just dispositions in particular cases is both reinforced and confounded by the suggestive phrase in which "equitable factors" appears—"such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). What court is to be the court that "determines"? Is it to be the trial court, a higher court on appeal, or each court (trial or appellate) in which a particular case is heard?

Whatever may be the answer to questions about what courts have precisely what roles, somewhere in the Third Branch this work must be done. Even though judicial decisions of the Supreme Court, the Courts of Appeals of the Circuits, state appellate courts, and federal and state trial courts have added substantial additional guidance for parties, attorneys, and trial courts concerned with resolving these controversies, still many critically important legal issues remain unaddressed, or the subject of conflicting opinions

and rulings, not yet resolved by the Supreme Court.

*Six.* Formulations of different legal tests for applying the statutory "equitable factors" mandate range widely as to where they fit along the generality-particularity spectrum. The closer a formulation is to the generality pole, the more discretion it leaves to the trial court (and perhaps to a jury) in applying that legal test to the particular case. The closer a formulation is to the particularity pole, the more guidance it provides to assure that like cases are decided consistently.

Absent another statutory intervention that provides more precise guidance, the choices that higher courts make, as more and different kinds of cases come before them for decision, will refine the guidance to trial courts and reduce the costs and other consequences of complexity and uncertainty in the law.

*Seven.* Until additional authoritative guidance is available, a trial court must decide unsettled legal questions essential to disposition of the case at hand on the basis of its predictions of the most likely resolution on appeal, if an appeal is taken.

*Eight.* Precedents interpreting the statutory phrase, "equitable factors," have often invoked the so-called "Gore Factors."

The Gore Factors are not an all-inclusive list. They are among the factors to be used by a trial court (and a jury, if this function is for the jury) in allocating responsibility for remediation costs. The Gore Factors were proposed by then-representative Al Gore for inclusion in an amendment to H.R.7020, to provide guidance to courts as to whether to impose joint and several liability. The House passed that proposal in 1980, but the bill did not become law.

*Nine.* The Gore Factors include, but are not limited to:

(i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved;

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*See In re Hemingway Transport, Inc.,* 993 F.2d 915, 921 n. 4 (1st Cir.1993) (citing *Environment Transp. Sys., Inc. v. ENSCO, Inc.,* 969 F.2d 503, 508–509 (7th Cir.1992)).

*Ten.* Both the statutory mandate for "equitable factors" and the precedents invoking Gore Factors suggest that courts must use, in deciding a particular case, a threshold requirement that is equitable in nature.

The use of the term "equitable" in this context does not mean that the threshold test must be treated, for purposes of allocating functions between judge and jury, as equitable in a sense that precludes a jury from having more than an advisory role. After all, the body of jurisprudence known historically as "equity," though confronting problems arising from noisome odors in a neighborhood, never purported to prescribe for industrial and commercial wastes like those of the 20th century. Rather, "equitable" as used in the statutory text of SARA, in 1986, and as explained in the Gore Factors and in precedents governing civil actions for contribution under CERCLA, is more appropriately interpreted as meaning fair and reasonable.

■ The "equitable factors" mandate is appropriately interpreted as at least authorizing, if not mandating for this case, making comparisons between plaintiffs in a contribution action and defendants whom they allege to be potentially responsible parties, by considering evidence before the court (and jury, if one is used) for the purpose of determining whether the nature and extent of their re-

spective ties to the hazards to persons, property, and the environment make it fair and reasonable to order that a defendant, or defendants grouped together for good reason, reimburse the plaintiffs in some amount or some share of "contribution", allocated on an equitable basis reasoned from evidence concerning all the "equitable factors" for the application of which in this case some evidentiary basis exists.

■ *Eleven.* It is a fundamental principle of the legal system that courts are to leave harms and losses where they find them unless some good reason appears for shifting a loss from one party (or set of parties) to another party (or set of parties).

*Twelve.* Since, at least in the First Circuit, the primary relief sought by plaintiffs against each defendant in a contribution action is an order that the defendant pay to plaintiffs an equitably determined share in partial reimbursement, plaintiffs must proffer evidence sufficient to support a finding that hazardous substances traceable to that defendant were (in nature, quantity, and durability) sufficient to invoke an exception to point *Eleven.*

■ A corollary of keypoint *Twelve* bears emphasis. Plaintiffs must show reasons for court intervention that outweigh the public interest against recognizing causes of action the enforcement costs of which exceed the added resources that would be tapped for waste-site remediation. They must make at least a prima-facie showing that equitable allocation may occur without placing on the defendant a burden proportionally inequitable to the burden remaining on plaintiffs after collection of contribution. The plaintiffs' assertion that this prima-facie showing has been made must be supported by the evidence before the court at the close of plaintiffs' case.

In the present case, more legal questions, still unsettled, must be answered to determine the outcome of plaintiffs' claims against CDE, but the twelve points stated here lead to a judgment as a matter of law for other defendants. The guidelines already made clear by the combination of relevant statutory and decisional law support the conclusion that plaintiffs must at least satisfy the stan-

dard stated in point *Twelve* and its corollary to show that a particular defendant, as a source of one or more hazardous substances deposited at a site of contamination, is subject to liability in this contribution action to reimburse plaintiffs for a share of the remedial costs they have incurred or may incur.

In other words, plaintiffs must proffer sufficient evidence as to a particular defendant to satisfy a minimum standard of significance of that defendant's responsibility as a source of one or more hazardous substances deposited at the site. Absent such a showing, even the least stringent formulation of a legal test including an "equitable factors" component would require a determination that it is inequitable to put the defendant to the burden of defending itself when the predictable outcome as to the claim for allocation of an equitable share of contribution, in the event of an outcome as favorable to plaintiffs as can be reasoned from evidence, would be a share so small that the public interest in remediation of hazardous waste sites would have been disserved because of the commitment of public and private resources to litigation over that alleged share of contribution.

To be consistent with the "equitable factors" mandate, any equitably fashioned minimum standard must demand substantially more of plaintiffs than would a *de minimis* or *scintilla* standard, such as plaintiffs suggest as an alternative to their more extreme contention that any trace of hazardous substances from a defendant is enough to support a judgment for an undetermined extent of contribution, leaving to that defendant the burden of obtaining a jury finding limiting the share.

### D. Plaintiffs' Presumption-of-Innocence Theory

■ Plaintiffs ask this court to fashion and invoke a presumption of innocence for their benefit. They are unable, however, to point to any precedent or statutory provision that supports their novel theory.

As stated in keypoint *Eleven,* Part I.C above, it is a fundamental principle of the legal system that courts are to leave parties where they find them unless some good rea-

son for shifting a loss appears. As proceedings begin in a civil action for contribution, plaintiffs are no more entitled to a presumption of innocence than are the parties from whom they seek contribution. Plaintiffs have not done enough to alter the status of equals before the court by showing merely that the consent decree to which they agreed contained a recitation that they admitted nothing. A boilerplate recitation that wrongdoing is not admitted is not transformed into a finding of innocence by a court's approval of the agreement as a consent decree.

During the plaintiffs' own case in chief, the evidence disclosed that the separate operations of all the plaintiffs over decades, along with waste disposal policies and practices of the City of New Bedford, were the major sources of waste deposits at the Sullivan's Ledge site. In these circumstances, before they can become entitled to favored treatment, plaintiffs need to proffer evidence to support findings explaining why, if they were completely innocent, they chose to commit themselves to paying the large sums they now claim they should be allowed to recoup from others? In the circumstances disclosed during plaintiffs' case in chief, the plaintiffs' status as settlers with EPA is not a valid reason for departing from the fundamental principle stated in keypoint *Eleven*. To invoke the processes for the administration of justice, plaintiffs must show, at the least, that the parties they have elected to sue are among those responsible to some significant degree, as measured by an appropriately fashioned threshold-of-significance standard, for deposits of hazardous waste at the site.

## II. Applying the Mandates and Guidelines to Motions for Judgment as a Matter of Law Made During Trial

### A. Insufficiency of the Evidence as to Sources of Hazardous Waste Deposited at Sullivan's Ledge

In previous rulings in this case, the court has ordered judgment as a matter of law for two defendants.

By interlocutory order of July 24, 1996, the court granted the motion of New England Telephone & Telegraph Co. ("NETT") for summary judgment because of the insuffi-

ciency of plaintiffs' proffered evidence to support a finding of causal connection between the sparse quantity of allegedly hazardous substances traceable to NETT, or its predecessor entities, and plaintiffs' incurring costs for which they seek contribution. *Acushnet Co. v. Coaters Inc.*, 937 F.Supp. 988 (D.Mass. 1996).

Later, after plaintiffs had been fully heard at trial as to their claims against Federal Pacific Electronic, Inc. ("FPE"), the court held a hearing, stating its findings and conclusions on the record, and ordered judgment as a matter of law for FPE. Transcript, Nov. 7, 1996, pp. 43–57. Again, the reasons for the judgment as a matter of law emphasized insufficiency of the evidence.

After consideration of the extensive filings of all parties and of their arguments at oral hearings on December 1–2, 1996, I concluded that the motions of three more defendants for judgment as a matter of law should be granted because of insufficiency of the evidence to satisfy even the least demanding of the various, more particularized, legal tests possibly open to adoption as consistent with statutory and decisional guidance.

I have not decided, and do not at this time decide, reasonably debatable issues of law I may yet have to decide in order to reach a final judgment that determines whether the remaining defendant, CDE, is subject to legal accountability for shares of the costs incurred and to be incurred by plaintiffs.

Plaintiffs have contended, as the most extreme among many alternatives asserted, that evidence supporting a finding that any quantity, even the slightest, of one or more hazardous substances traceable to a particular defendant as a source is enough to support liability for some share of contribution that would reimburse part of plaintiffs' incurred costs. This contention, or one virtually like it, has sometimes been referred to as the legal theory that even a scintilla of evidence is enough to satisfy the threshold requirement, or as a contention that even a *de minimis* contribution of hazardous substance to the site is enough to support a plaintiff's claim in a contribution action. This legal contention, in any of the varied formulations,

is entirely unsupported by statutory text and interpretive decisions in the First Circuit. It is rejected.

Plaintiffs have contended, as a slightly less extreme alternative, that evidence that is at least barely more than would fail a scintilla or *de minimis* standard is enough to survive a motion for judgment as a matter of law. This legal contention, likewise, is entirely unsupported by statutory text and interpretive decisions. It is rejected.

What is the law as to a threshold-of-significance standard that plaintiffs must satisfy to defeat a motion for judgment as a matter of law?

Without finally answering that question, I conclude that plaintiffs' proffer of evidence against the three defendants considered here is so scant that it does not approach satisfying even the least demanding among more particularized formulations of a standard consistent with the statutory and decisional guidelines. Thus, the overriding reason for judgments as a matter of law for these defendants is the stark scantiness of the evidence proffered against them.

 One circumstance that weighs heavily in favor of judgment for these defendants concerns the quantity (or "mass," as it is sometimes referred to in EPA documents) of hazardous substances deposited and found at the Sullivan's Ledge site. Evaluated on this basis, the proffered evidence relevant to plaintiffs' claims against American Flexible Conduit ("AFC") is somewhat more substantial than that bearing on claims against Mohasco and Ottaway Newspapers, so I turn first to reciting key indisputable characteristics of the evidence against AFC.

Viewed most favorably to plaintiffs, the evidence would support an estimate that waste steel conduit cable of a length of 5,000 to 10,000 feet was traceable to AFC, that when coiled and pressed in a dump site it would have occupied two cubic yards. That amount of mass is thousands of times less than the remaining contributions of others necessary to fill the enormous quarry pits left by Sullivan's enterprise. Thus, AFC's share of the volume of solid waste was no more than one share in thousands, probably many thousands.

If we were to use a $50,000,000 estimate of response costs potentially involved in plaintiffs' claims for contribution as a basis for comparison, AFC's one share would be a small fraction of the litigation costs of plaintiffs alone in pressing their claim against AFC, even if successful.

If instead we use a larger estimate of total costs, because of the City's share and other EPA costs as explained in the introduction to this opinion, an equitable share allowable to AFC would rise, but still not enough to approach the litigation costs of the plaintiffs alone. If litigation costs of the defendant and the public are also considered, the comparison becomes even more unfavorable to the plaintiffs' claims.

It seems unlikely we should construe an Act of Congress, permitting plaintiffs to proceed against a defendant to establish a right to contribution on the basis of "equitable factors," as authorizing a claim for a share as small as AFC's share would turn out to be, even if plaintiffs were to win, when the proof of entitlement to that share would require a trial of the length of this trial, extending to 30 court days or more, at a cost in public and private resources at least tens and perhaps hundreds of times more than the share for which judgment would then be entered.

Of course, this comparison is only one among many comparisons that would be relevant as factors in any allocation based on "equitable factors." For example, a comparison based on the nature, quantities, toxicities, and durability (or persistence in the environment) of any hazardous substances included in AFC's waste cable might be regarded as more significant than a comparison of the total quantity of waste of which the hazardous substance was a part. The evidence proffered against AFC, viewed most favorably to plaintiffs, would support an inference that the two cubic yards of solid waste traceable to AFC included some tiny percentage of substances that statutes and EPA regulations have characterized as hazardous in some sense, for some purpose of decisionmaking. *See e.g.,* 42 U.S.C.A. § 9601(14); 40 C.F.R. § 302.4. The evidence

would support an estimate that, in this waste cable, was as much as 38 pounds of zinc and .25 pounds of lead. Compared to the enormous quantities of these substances at the site, for which no estimate as reliable as that for total quantity of solid waste could be made, nevertheless one could make some kind of estimate, and more probably than not it would work out to an even smaller share than would the comparisons of mass alone.

Plaintiffs' contention that its evidence against AFC is sufficient fails every version one might conceive of an "equitable factors" test. I conclude that I must reject this contention of the plaintiffs.

## B. Insufficiency of Scientific and Expert Opinion Proffers to Change the Outcome on Motions for Summary Judgment Midway in Trial

Although the court received some scientific and expert opinion evidence in the presence of the jury, and took additional evidence out of the presence of the jury as proffers, this scientific and expert opinion evidence was not sufficient to change the conclusion stated in Part II.A, above, that judgment for Ottaway, AFC, and Mohasco should be ordered forthwith. The reasons are illustrated by characteristics of the scientific and expert opinion evidence bearing especially on plaintiffs' claims against Mohasco.

■ Mohasco's challenge to the sufficiency of the evidence overall depends more than the challenges of Ottaway and AFC upon the contention that the evidence of deposits attributable to Mohasco was not only minimal as to quantity, compared with quantities attributable to plaintiffs, but also even less significant because of undisputed scientific knowledge to the effect that the kinds of hazardous substances allegedly attributable to Mohasco would not "persist in the environment." For example, concessions made by one or more of plaintiff's witnesses would compel an inference that acidic substances identified by EPA as hazardous, when present at a site in quantity requiring remediation, would not even have reached the site because of chemical reactions with other materials included in the waste, of which they were a part, in transit to the site. This

contention of Mohasco did not require further consideration in the present case, though it might in the circumstances of other cases. If supportable as a matter of law, on the evidence in this case, this contention of Mohasco would simply have made an even stronger case for reaching the same result of a judgment as a matter of law after plaintiffs had been fully heard on the sufficiency of the evidence. The scientific and expert opinion was insufficient in any event to aid the plaintiffs in relation to the motions for judgment of Mohasco, Ottaway, and AFC.

## C. Insufficiency of Evidence of Causal Connection

The motions of Mohasco, Ottaway, and AFC for judgment as matter of law after plaintiffs had been fully heard were supportable on the grounds explained in Parts II.A and II.B, above. They were also supportable on the additional and independent ground that plaintiffs' evidence against these three defendants had the same fatal deficiency as the evidence plaintiffs proffered against NETT with respect to causal connection with remediation costs incurred or to be incurred by plaintiffs.

An element of the plaintiffs' prima-facie case is that the defendants' disposal activities were at least a cause among others of the plaintiffs' incurring response costs. *Acushnet Co. v. Coaters, Inc. supra. See also, e.g., Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996). With regard to the defendants for whom judgment as a matter of law is explained here, the evidence proffered against these defendants is only slightly more than plaintiffs proffered against NETT in response to NETT's motion for summary judgment, and not enough more to be material to the outcome. Thus, I conclude that the motions of these defendants for judgment as a matter of law at this time are meritorious for the same reasons as are explained as grounds for summary judgment ordered for NETT on July 24, 1996.

## D. Conclusion

In view of the certainty of outcome resulting from (a) the volume-and-nature-of-haz-

ardous waste analysis, and (b) causation analysis, I conclude that I need not proceed farther, before allowing these judgments, into an analysis of other factors that might have a significant bearing on the outcome of the claims against CDE or claims that might arise in other cases. The appropriate outcome here is judgment as a matter of law for AFC, Mohasco, and Ottaway.

### III. Unresolved Issues

#### A. Trial Will Proceed in the Jury's Presence as to Plaintiffs' Claims Against CDE

The court has denied CDE's motion for judgment as a matter of law under Rules 50 and 52, without prejudice to the renewal of CDE's legal contentions as support for a later motion for judgment as a matter of law. Many additional issues of fact and law may arise before the jury trial is completed. Also, additional issues that bear upon the detailed terms of the final judgment must be considered.

Remaining for consideration are unsettled legal issues, some of which may be mooted by the verdict. Others are likely to be essential to determining details of the judgment in any event. For example, will Third–Branch implementation of the statutory mandates of CERCLA and SARA lead the Supreme Court eventually, and the Courts of Appeals of some or all of the circuits meanwhile, to conclude that courts must at least consider, among all the "equitable factors" an "economic realities" perspective? If so, must a court also consider whether the complexities of interwoven-legal-factual factors bearing on that perspective weigh heavily against allowing contribution actions to proceed *before a Jury*? In other contexts, easily distinguishable factually but nevertheless suggesting the possibility that courts may invoke this perspective more broadly, some recent judicial decisions have invoked a functional reconsideration of precedents regarding relationships among parties who exercise authority over conduct and activities that affect public interests and the interests of others outside those relationships. *See, e.g., Atlas Food Systems and Services, Inc. v. Crane National Vendors, Inc.*, 99 F.3d 587, 595 (4th Cir.1996) (federal district court should exercise its own independent judgment on appropriate amount of punitive damages when ruling on motion for new trial under Fed. R.Civ.P. 59(a), to make sure that amount is not so excessive as to constitute miscarriage of justice; as explained in *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), "highly discretionary calculations that take into account multiple factors" are "traditionally performed by judges"); *Simpson v. Ernst & Young*, 100 F.3d 436, 442–44 (6th Cir.1996) (invoking "economic realities" legal test in determining whether an accountant who had been designated a "partner" in an accounting firm was nevertheless an "employee" for purposes of Age Discrimination in Employment Act and Employee Retirement Income Security Act).

If the mix of "equitable factors" to be taken into account under the SARA mandate extends to all the complexities that may be involved in a thorough and well-informed weighing of "economic realities" and other equally or more complex realities of governmental and private-entity relationships, public and private interests, and transaction costs (including litigation costs) for implementing one or another type of remediation for toxic waste sites, the impact on the nature of decisions to be made in all three branches of government may be substantial. No probing of these issues has been necessary in this case, as yet, because decisions have been based on other grounds explained in Parts I and Part II of this opinion. I will invite further submissions from counsel as to whether these issues need be addressed in relation to plaintiffs' claims against CDE.

Another potentially debatable issue left open in this case at this point has far less sweeping potential significance but nevertheless can have important procedural consequences.

Is it appropriate for a trial court to require, at some point before a case is submitted to a jury, a degree of particularity of claims well beyond that sufficient to survive pleading requirements and perhaps even beyond that ordinarily required in response to defense motions for summary judgment or judgment as a matter of law under Rule 50

or 52? This is an issue considered with counsel both before and during the hearing on the various motions for judgment as a matter of law midway through trial, but not invoked in Part II of this opinion as a basis of the decision for AFC, Mohasco, and Ottaway.

█ Though applicable precedent is sparse, I conclude that in circumstances of complexity and interwoven legal and factual issues, when a plaintiff's claim is challenged by a defense motion for judgment as a matter of law, it is at least appropriate, if not imperative, that the court require "the plaintiff to set forth a coherent specific claim." *Grenier v. Vermont Log Buildings, Inc.,* 96 F.3d 559, 564 (1st Cir.1996) (applying this principle in the context of a dispute regarding federal preemption of a state-law claim based upon a wood preservative marketer's "failure to warn" of product's unsuitability for use in residences because the preservative contained the active ingredient pentachlorophenol). One way a court may go about determining whether a plaintiff has satisfied this requirement is to invite the plaintiff to frame precisely a set of special interrogatories submitting to a jury questions on any material and genuinely disputed factual issue that the plaintiff can identify and set forth as part of a coherent specific claim. The court has advised plaintiffs that their more generalized requests for submitting this case to the jury are unacceptable, and has invited more precisely fashioned interrogatories. The court has likewise advised defense counsel that their requests for submission of jury interrogatories in generalized form will be rejected, and has invited from them more precisely fashioned interrogatories.

## B. A Provisional Structure for Considering Burdens and Legal Tests in Contribution Actions

Application of the statutory "equitable factors" mandate to particular cases will, in some instances at least, require basic policy-weighing determinations about the scope of legal responsibility for toxic waste disposal and remediation. Both the trial court and the jury must respect and act consistently with the manifested statutory policy choice bearing upon scope of liability of responsible and potentially responsible parties. In some circumstances, legal and factual issues may be so interwoven and interdependent that the court (under guidance of statutes and precedents), not the jury, must perform any basic policy-weighing function left by SARA for resolution "as the court determines." 42 U.S.C. § 9613(f)(1). In order to address this debatable issue of law about judge-jury allocation of functions, I have provisionally determined to proceed on the premise that the following structure for considering burdens and legal tests for resolving remaining issues is appropriate.

1. *Plaintiffs' Burden as to Threshold of Significance.* Plaintiff has a burden to show that a defendant was a source of deposits, at the relevant site, of hazardous substances in quantity, nature, and durability (or persistence in the environment) satisfying a threshold of significance.

 a. If the admissible evidence proffered by plaintiff fails to satisfy this threshold-of-significance burden against a particular defendant, that defendant's motion for judgment as a matter of law under Rules 50, 52, or 56 will be granted.

 b. If the admissible evidence proffered by plaintiff does satisfy this threshold-of-significance burden against a particular defendant, and that defendant nevertheless wishes to press its motion for judgment as a matter of law, the burden shifts to that defendant as stated in step 2 below.

2. *Defendant's Burden of Production as to Absence of a Basis for Equitable Allocation of a Share to Defendant.* A defendant may offer evidence to show that it is entitled to judgment as a matter of law because, even though plaintiff has satisfied the threshold-of-significance burden, hazardous substances from defendant as a source were so limited in quantity and nature in comparison with the hazardous substances from other sources that, as a matter of law, that defendant's contributions were too small proportionally to warrant allocation of any share of responsibility under an "equitable factors" test.

 a. If a defendant fails to satisfy this burden, disputed factual issues bearing

upon the court's application of an "equitable factors" test go to the finder of facts.

 b. If a defendant satisfies this burden, the case proceeds to step 3.

 3. ***Plaintiff's Response.*** A plaintiff may offer evidence to rebut the evidence that a defendant offered to satisfy the defendant's burden of production.

 a. If the plaintiff fails to offer evidence sufficient to present a genuine dispute of fact material to the court's application of an "equitable factors" test and the court holds that application of an appropriately fashioned "equitable factors" test for the case produces an outcome favorable to the defendant as a matter of law, judgment will be ordered accordingly.

 b. If the plaintiff succeeds in offering evidence sufficient to present a genuine dispute of fact material to outcome, the case goes to the finder of facts.

Counsel have been invited to present, during the remaining proceedings in this case, their respective contentions about whether this decisionmaking structure is appropriate in the distinctive circumstances of this case and what outcome the court should reach if this structure is used. Also, counsel have been invited to submit their respective proposals as to how the court should deal with the burden of proof in the verdict form and in the charge to the jury.